## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL CASE NO. H-04-514-SS |
| | § | |
| MICHELLE VALENCIA | § | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL CASE NO. H-06-080 |
| | § | |
| GREG SINGLETON | § | |

### MEMORANDUM AND ORDER

Pending before the Court in these related criminal cases are interested party The

McGraw-Hill Companies, Inc.'s Motion to Intervene and For Limited Protective Order

[Doc. # 119] ("McGraw-Hill's Motion") and interested parties Intelligence Press, Inc.

and NGI, Inc.'s Motion For Limited Protective Order [Doc. # 129] ("NGI's Motion").[1]

The motions have been fully briefed and argued.[2]  They are now ripe for decision.  In

moving for protective orders, the movants have presented materially identical

---

[1]     Unless otherwise indicated, the Court refers to documents by the number in the docket in *United States of America v. Greg Singleton and Michelle Valencia*, Criminal Case No. H-04-514.

[2]     The Government has filed a Response [Doc. # 119].  McGraw-Hill has filed a Supplemental Brief [Doc. # 128].  On May 31, 2006, the Court entertained live witness testimony and oral arguments on the motions.

arguments.  The Court therefore will consider their motions jointly.  NGI has adopted

the legal grounds asserted in McGraw-Hill's Motion for protective order.  Having

considered the parties' submissions and oral arguments, all matters of record, the

evidence at trial, and applicable legal authorities, the Court concludes that McGraw-

Hill's and NGI's Motions should be **granted in part and denied in part**.

## I.  <u>BACKGROUND</u>

McGraw-Hill, through a division called Platt's, has published *Inside FERC*'s

*Gas Market Report* ("*Inside FERC*") since 1985.  NGI also reports on the natural gas

industry and has published monthly natural gas price indices for physical gas

transactions ("spot gas prices") since 1983.

Beginning in 2002, the United States Commodity Futures Trading Commission

("CFTC"), the Federal Energy Regulatory Commission ("FERC"), the United States

Department of Justice (through various United States Attorney's Offices), and other

federal and state agencies instituted investigations relating to the natural gas industry.

Numerous criminal indictments resulted, including the two in these cases.  One of the

indictments at bar alleged that Michelle Valencia, a natural gas trader with Dynegy,

Inc. ("Dynegy"), submitted false trade data to McGraw-Hill and NGI (collectively, the

"Publishers") over a period of approximately one year.  The indictment against

Singleton alleged that he submitted false trade data during two months while employed

by El Paso Merchant Energy ("El Paso").  Defendants Singleton and Valencia were

charged with conspiracy, wire fraud, and violations of the Commodities Exchange Act, based on the reporting of fictitious trades to the Publishers.

*Inside FERC* was and is a McGraw-Hill newsletter focused on the natural gas industry. *Inside FERC* contains monthly natural gas price indices for approximately seventy United States delivery locations (often called "hubs"). To create these indices, McGraw-Hill conducted confidential monthly surveys requesting detailed data on numerous companies' fixed-price natural gas baseload transactions negotiated during approximately the last five business days of the month (known as "bidweek").[3] The survey asked the sources to provide transaction details such as price, volume, location for delivery and identity of the other contracting party (the "counterparty"). The sources were to report actual natural gas transactions; private bilateral commercial deals not publicly reported. The *Inside FERC* editors relied primarily on the confidential survey responses to calculate the volume weighted averages of the reported transactions. In a typical month, hundreds of transactions were reported for each of the

---

[3]    Baseload natural gas transactions are contracts to deliver a specified quantity of natural gas at a designated location each day of the calendar month stated in the contract. These transactions often were negotiated directly between traders of the contracting companies. During the relevant period, some contracts were entered into through voice brokers or on Internet platforms such as Enron-On-Line ("EOL"). These bilateral physical gas contracts are distinct from financial transactions such as "swaps" or futures contracts traded on the New York Mercantile Exchange.

seventy locations.[4]  Most survey responses were submitted to McGraw-Hill via email. These submissions, plus reporters' telephone conversations, were the bases for McGraw-Hill's editors' analysis.[5]  *Inside FERC*'s  price indices were used to set the price for physical natural gas contracts as well as certain financial contracts in certain locations.

McGraw-Hill's sources, the traders from dozens of companies that bought and sold natural gas, provided their trade information on the explicit agreement by *Inside FERC* that the sources' identities would be kept confidential and the trade information would not be attributed to a particular company or trader.  According to McGraw-Hill, confidentiality was and still is crucial to maintaining the survey's reliability as a transparent and comprehensive news source.  McGraw-Hill also asserts that, after McGraw-Hill received subpoenas seeking trade data, an unspecified number of natural gas sources stopped providing their transaction information due to concerns that the information would become public.[6]

---

[4] Not all traders reported real transactions.  At least some of the information sent to the Publishers was fictitious.

[5] Often, the index price matched the volume weighted average of the reported trades. However, the *Inside FERC* editor testified that, prior to calculating the volume weighted averages, he removed from the data reported trades that he deemed to be "outliers," *i.e.*, trades that appeared to be aberrational for one reason or another.

[6] Kelley Doolan, the editor of *Inside FERC*, acknowledged, however, that some of those companies have resumed reporting and new companies that trade natural gas have begun to

(continued...)

In 2000 and 2001, NGI employed methods similar to those used by McGraw-Hill. NGI conducted confidential surveys of natural gas buyers and sellers to obtain trade data on baseload physical natural gas transactions negotiated during bidweek. Much of the data was submitted to NGI by email or fax. The NGI reporters and editors considered all this data in light of other trade information obtained orally (usually over the phone) from traders and others with interest in the natural gas industry.[7] Based on the information it received from traders, NGI published an index price for each location.[8] To determine each index price, NGI first calculated a volume weighted average for the reported trades at that location, including all data it considered reliable. Reported data that appeared to be abberational (statistically or otherwise) were not included in the calculations. In evaluating whether to eliminate trades from the analysis NGI looked *inter alia* at the high and low reported trades for each reporting location, as well as publicly available current and historical information as well as the other private data the publisher obtained. NGI's price indices were (and still are) used as a

---

[6]    (...continued)
       report.

[7]    Occasionally, these reporters apparently accepted reports of trades over the phone if the report was close to the publication deadline.

[8]    NGI acknowledged that it did not publish an index price if there were insufficient data for a particular month at a particular location.

means to price physical natural gas contracts and certain financial contracts for delivery at certain locations.

NGI explains that in order to obtain survey information from participants in the natural gas markets, NGI pledged strict confidentiality of the identities of the sources and transaction detail.  NGI contends that this confidentiality commitment is key to the large number and wide range of survey sources it developed.

In response to grand jury and other subpoenas, the Publishers produced three types of documents relevant to this case: (1) hard copies and electronic versions of email and fax submissions from El Paso and Dynegy to the Publishers during late 1999, 2000 and 2001 containing bidweek trade data (the "Source Data"); (2) electronic databases (saved in Microsoft Office Excel) compiled by the Publishers, which contained all or the vast majority of the Source Data described above (the "Databases"); and (3) hard copies and electronic versions of spreadsheets created by the Publishers in 2000 and 2001, containing reported bidweek survey trade data reflecting the data used to calculate the monthly natural gas indices (the "Publishers' Spreadsheets").

The Government's trial theory was that Defendants reported false natural gas trade data to the Publishers in order to affect the price of natural gas at certain United States locations in 2000 and 2001.  This false information allegedly resulted in certain index prices skewed in Defendants' companies' favor.

At trial, the Government and Defendants introduced in evidence copies of Source Data transmitted from Defendants' employers and affiliates, and copies of the Publishers' Spreadsheets for numerous months and locations.  The parties during trial explained to the jury how the Databases worked, how the imbedded formulas in the Databases enabled the Publishers to calculate automatically the volume weighted averages for each location in each pertinent month, and other information on how the Publishers' Spreadsheets were created and used.  The parties also relied during trial on the active Databases to demonstrate the effect certain companies' reported trades had on the volume weighted averages for locations in issue.  In so doing, the parties created additional spreadsheets for the jury's consideration ("Trial Spreadsheets") and printed these documents to memorialize the points.  The Court received hard copies of the Trial Spreadsheets in evidence.  By agreement, the electronic Databases themselves were not received in evidence and are not part of the official trial record.

## II.   ANALYSIS

### A.   Summary of Dispute

The Publishers contend the electronic and hard copy documents they produced in response to grand jury subpoenas—the Source Data, Spreadsheets, and Databases—should be withheld from public view at all times because they are proprietary and confidential.

At a pre-trial evidentiary hearing on May 31, 2006, the Court heard testimony and oral argument on the motions.  At the end of the hearing, in accordance with an agreement among the parties and Publishers, the Court denied the Publishers' motions in part.  That agreement provided:

(1)     the parties would use at trial both hard copies and electronic versions of the Source Data, Publishers' Spreadsheets, Trial Spreadsheets, and Databases, as needed, so long as the copies were displayed on screens during trial solely for use of the parties, the jurors, and the Court.

(2)     As noted above, the Court would receive in evidence only hard copies of the Source Data and the Publishers' and Trial Spreadsheets. Neither the electronic Databases nor electronic versions of any other documents were offered in evidence or made part of the permanent trial record.  Accordingly, while deliberating, the jury did not have access to the Databases or other electronic material from the Publishers.

This agreement and procedure obviated many of the Publishers' concerns regarding the public dissemination of the Databases, Spreadsheets,[9] and Source Data. Still in dispute for decision by the Court is whether, post-trial, copies of the Source Data or the Spreadsheets (collectively, "Publisher Documents") received in evidence in hard copy will be filed in the public record at all and, if so, whether the filed copies will be redacted.

---

[9]     Hereafter, the Court uses the term "Spreadsheets" to refer to the Publishers' Spreadsheets and Trial Spreadsheets collectively.

### B.   Post-Trial Availability of Publisher Documents

The Publishers move to seal or, alternatively, to redact Publisher Documents received in evidence at trial.  The Publishers maintain that sealing of these materials post-trial is warranted because the exhibits contain trade secrets, proprietary, competitively sensitive, confidential and privileged business information, which if divulged would cause significant competitive harm to the Publishers and their sources.

The Publishers argue that the Source Data exhibits, which are emails and faxes from Defendants' employers (Dynegy and El Paso), contain trade data on actual and fictitious gas transactions, and thus are the *Publishers'* trade secrets akin to customer lists.  The Publishers assert that public disclosure of the Spreadsheets would reveal the Publishers' confidential sources, divulge trade data such as reporting companies' individual trades, patterns of trading, and pricing assessments.  The Publishers add that this information collectively would reveal their editorial methodologies and the proprietary format of the Spreadsheets, which competitors would attempt to replicate. The Publishers submit that if the identities of their confidential sources are available in the public record after trial, the Publishers will lose their sources and, consequently, the ability to publish reliable price indices.   The Publishers similarly assert that their publishing competitors would benefit from the disclosure of the Publishers' sources and methodologies.  Finally, the Publishers urge that the Court, in weighing the competing

interests in this case, should also consider constitutional protections afforded the Publishers as news gathering entities in other proceedings.

In response, the Government argues the Source Data exhibits are not trade secrets because it was Defendants or their co-workers who created the documents, not the Publishers.  Second, the Government points out that there is nothing secret any longer about the contents of these companies' reports of trades, which notably, occurred in 2000 and 2001, if not earlier.  The Government adds that only in isolated instances is the identity of a counterparty listed, and it is far from clear that any particular trade listed actually occurred.  The Government also argues that the sources are well known; at best, the data is stale; and in many instances in the trial exhibits, the reported data is fictitious.  The Government also asserts that the Spreadsheets are not trade secrets or confidential because the documents are merely Microsoft Excel tables, the formulas used in them are obvious, and the Publishers' methods for compiling data are disclosed on the Publishers' websites and otherwise are well known.

## C.   <u>Legal Standards</u>

### 1.   **Presumption of Openness**

The First Amendment to the United States Constitution prohibits any law "abridging the freedom of speech, or of the press." U.S. CONST. AMEND. I.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the

right to a speedy and public trial." U.S. CONST. AMEND. VI.  As explained by the Supreme Court, "[t]he right to an open and public trial is a shared right of the accused and the public, the common concern being the assurance of fairness." *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 7 (1986); *Waller v. Georgia*, 467 U.S. 39, 46 (1984).  When analyzing the propriety of trial closure under either the First or Sixth Amendment, a court is required to conduct the same searching inquiry. *See Waller*, 467 U.S. at 47–48.

The First Amendment requires not only a presumption of openness of the courtroom but openness of court files as well. *SEC v. Van Waeyenberghe*, 990 F.2d 845, 849–50 (5th Cir. 1993); *In re Gannett News Serv., Inc.*, 772 F.2d 113, 115–116 (5th Cir. 1985).  Courts have recognized that the public has a strong common law right to access judicial records and proceedings, although this right is not absolute. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *Van Waeyenberghe*, 990 F.2d at 848.  Public access serves important interests, such as "to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness." *Van Waeyenberghe*, 990 F.2d at 849 (quoting *Littlejohn v. BIC Corp.*, 851 F.2d 673, 682 (3d Cir. 1988)).  Accordingly, there is a presumption in favor of public access to judicial records. *See id.* at 848.

In *Richmond Newspapers, Inc. v. Virginia*, the Supreme Court explained that "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." 448 U.S. 555, 573 (1980) (plurality opinion). Public criminal proceedings ensure that "judge and prosecutor carry out their duties responsibly." *Waller*, 467 U.S. at 46. "[T]here can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Id.* The right to openness in criminal proceedings may give way in certain cases to other rights or interests, such as the disclosure of sensitive information; but, "[s]uch circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.* at 45.

"Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon*, 435 U.S. at 598. The Supreme Court has articulated the following four-factor test for determining when a total closure of a courtroom overrides the presumption of an open trial: (1) a party seeking to close a court proceeding must advance an overriding interest that is likely to be prejudiced; (2) the closure must be no broader than necessary to protect that interest; (3) the trial court must consider reasonable alternatives to closing the proceeding; and (4) it must make findings adequate to support the closure. *Waller*, 467 U.S. at 48. A "partial closing of court proceedings

does not raise the same constitutional concerns as a total closure, because an audience remains to ensure the fairness of the proceedings." *United States v. Osborne*, 68 F.3d 94, 99 (5th Cir. 1995).  Accordingly, the first factor in the above test is less demanding for partial closures.  The party seeking a partial closure need only show a "substantial reason" for the closure instead of an "overriding interest." *See id.* at 98–99.

### 2.   Trade Secrets

Under Texas law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)).  Texas courts consider six nonexclusive factors in deciding whether a trade secret may be protected from disclosure or use:

> (1) the extent to which the information is known outside the business;
> (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (citing *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)).  The party claiming trade secret status bears the burden of proof of establishing that something is a trade secret. *Stewart & Stevenson*

*Serv., Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 99 (Tex. App.—Houston [14th Dist.] 1994, writ denied). However, "the party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time." *In re Bass*, 113 S.W.3d at 740. "Information generally known and readily available is not protectable, but the fact that information is discoverable by lawful means does not deprive its owner of protection from one acquiring it by unfair means." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 198 (Tex. App.—Fort Worth 2005, no pet.) (citing *In re Bass*, 113 S.W.3d at 739); *see also Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied) (holding "information generally known and readily available is not protectable" as a trade secret); *Sw. Research v. Keraplast Techs., Ltd.*, 103 S.W.3d 478, 481 (Tex. App.—San Antonio 2003, no pet.) (holding "information generally known and readily available is not protectable, and no trade secret protection is available when the material or procedure at issue has been publicly disclosed").

**D.    Discussion**

**1.    Source Data**

The Publishers first argue the Source Data itself (*i.e.*, the contents of the reports) submitted by Defendants on behalf of their employers are trade secrets akin to customer lists. The Publishers request sealing or post-trial redaction of Source Data exhibits to

prevent disclosure of the identities of the confidential sources and the trade counterparties.  The Court is not persuaded.  The hard copies of Source Data received in evidence at trial will be maintained in the public record without redactions.  The Source Data exhibits are solely submissions from Dynegy and El Paso to the Publishers sent by or at the direction of Singleton or Valencia.  These materials contain information about putative trades of Defendants' employers, Dynegy and El Paso.  The Publishers did not create these documents.  Neither Dynegy nor El Paso has argued that the contents of these documents are in any way confidential or proprietary at this juncture.  These companies have not contended in this Court that the materials should be held under seal.  The Publishers have not identified, and the Court is not aware of, any authority holding that one may claim trade secret protection when the documents in issue were created by others.  Accordingly, the Publishers fail to overcome the public's "common law right to inspect and copy judicial records."  *See Van Waeyenberghe*, 990 F.2d at 848 (citing *Nixon*, 435 U.S. at 597).

The Publishers also argue that the identity of the sources of the Source Data is confidential.  This argument is rejected.  The fact that El Paso and Dynegy were sources of information to the Publishers was not secret and is not entitled to any trade secret or other protection.  The fact that these companies submitted real or putative trade information to the Publishers is well-known from the publicity surrounding

Defendants' indictments and trial, the companies' press releases upon receipt of Government subpoenas, and Defendants' wide dissemination of the information in connection with trial.[10]  *See Bell Helicopter Textron*, 160 S.W.3d at 198; *Trilogy Software*, 143 S.W.3d at 467; *SW. Research*, 103 S.W.3d at 482; *In re Bass*, 113 S.W.3d at 739 (holding "generally known and readily available" information is not entitled to protection as a trade secret).[11]

         2.      **Spreadsheets**

The Publishers request that the Court, after trial, seal in their entirety the hard copies of the Publishers' Spreadsheets received in evidence.[12]  As noted, the Spreadsheets are charts listing location, source, price, volume, date and, if available, the counterparty for each transaction reported by numerous natural gas industry trading participants.  The Publishers contend disclosure of their Spreadsheets in any respect would identify the Publishers' confidential sources, the sources' counterparties, and the

---

[10]    The Government alleges Valencia reported false trade data for a Dynegy affiliate, West Coast LLC, an entity Dynegy owned with another major oil and gas company.  For purposes of this Memorandum and Order, the Court does not distinguish Dynegy from West Coast LLC.

[11]    The Court notes that Defendants reported the identity of trade counterparties in only a tiny number of the 1,000+ trades listed in the Source Data exhibits received in evidence at trial. There is no evidence that the identity of these counterparties is generally known or readily available.  However, given that the evidence demonstrated the counterparties were listed on reported trades that largely were fictitious, there is no reason to seal or redact these exhibits on this basis.

[12]    The *Inside FERC* Spreadsheets are Government Exhibits ("GX") 26, 33, 42,49, 54, 57, 63, 70, 79, and 86.  NGI Spreadsheets are GX 19, 28, 35, 44, 51, 65, 72, 81, and 88.

editors' analyses and methodologies.  The Publishers contend that these revelations would permit competitors to replicate the proprietary aspects of the Spreadsheets.

The Court declines to seal copies of the Spreadsheets received in evidence.  The Court instead will require the parties to redact the names of the source companies for all trades other than those reported by or at the direction of Singleton or Valencia.  The names of reported counterparties also will be redacted.  The Court declines to permit redaction by *Inside FERC* of the layout of its Spreadsheets.  Only the redacted Spreadsheets as described herein will be filed in the public record.

This result is dictated by an analysis of six non-exclusive factors that Texas courts consider in deciding whether a trade secret may be protected from disclosure or use:  "(1) the extent to which the information is known outside the business; (2)  the extent to which it is known by employees and others involved in the business; (3)  the extent of measures taken to safeguard the secrecy of the information; (4)  the value of the information to him and to his competitors; (5)  the amount of effort or money expended in developing the information; and (6)  the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Gen. Universal Sys.*, 379 F.3d at 150 (citing *In re Bass*, 113 S.W.3d at 739–40) (collectively, the "*Bass* factors").

**Company Names.**— Applying the *Bass* factors, the Court finds that the names of the companies listed in the Spreadsheets as trade participants should be protected as the Publishers' trade secrets. These Spreadsheet entries reveal not only the identities of the Publishers' sources, but the identities of companies who traded at each location, and the volumes and prices of their trades[13] for the many months in issue. These companies' identities (for any given month and location) have not been publicly disclosed. While there is some testimony in the record disclosing the identities of a few of the reporting companies besides Dynegy and El Paso, the identity of the vast majority of the sources and where they traded do not appear to be available publicly.[14] The Publishers made representations of strict confidentiality to the sources of the trade data, and the sources appeared to value those promises.

Second, McGraw-Hill and NGI vigorously protect within each of their firms the identity of their confidential sources and the trading data they collect from those sources. McGraw-Hill employees are required to sign a code of ethics that expressly forbids divulging confidential source identities. Both McGraw-Hill and NGI have

---

[13]   The Court refers here to these companies' trading practices as reported to the Publishers. Despite some evidence to the contrary for certain companies, the Court assumes for the purposes of this ruling that the companies listed on the Spreadsheets reported actual trades during the 2000 and 2001, the years in issue in this case.

[14]   The trial testimony revealed that various reporting companies' traders freely disclosed their trading and reporting practices, but there is no evidence that most of the reporting companies did so.

strenuously opposed disclosure of their sources throughout this case and in other judicial and administrative proceedings.

Third, although less weighty, the identity of McGraw-Hill's and NGI's sources from 2000 and 2001 might have some value to the Publishers' competitors. The Publishers worked years to develop relationships with sources. Should the identity of the sources be divulged, publishing competitors would know which companies were at one time willing to report trade data, giving them leads to pursue for business. Although each Publisher's editor-witness testified that the Spreadsheets received in evidence were not necessarily the final versions of the documents from which they derived the published index prices, the Spreadsheets each contain enormous amounts of information which, if revealed in their entirety, would undermine the Publishers' competitive advantage.

Fourth, the Publishers have invested years of time and effort recruiting confidential sources. To gain the sources' trust, the Publishers made representations of strict confidentiality to the sources of the trade data. Some of the information on the documents is both proprietary and sensitive to the source companies.

Fifth, there is no evidence that the extensive details contained in the Spreadsheets about each reporting company's trading practices are known outside the respective reporting companies individually. The Court shares the Publishers' concern

about the adverse precedent that would be set by unlimited disclosure of the Spreadsheets. Disclosure of the details of thousands of reported transactions for many months–even long after the trades here in issue–could impair the Publishers' ability to gather trading data in the future because of the reporting companies' fear that this precedent would be repeated in other *fora* as to more recent (and thus more sensitive) periods of time. One company, with the unredacted data from a single full Spreadsheet, could correlate other companies' reported trade data to its own advantage. Thus, the reporting companies have reasonable concerns that disclosure of the Publishers' source companies' names and recent trading information would harm them.

In the aggregate, the evidence weighs in favor of protecting the identity of the Publishers' sources and their trade data as trade secrets. *See In re Bass*, 113 S.W.3d at 739–40.

***Counterparties' Identities.*—** The Court turns to the issue of whether the identities of trading counterparties listed in the Spreadsheets are protectable as the Publishers' trade secrets. Initially, it is noted that the Spreadsheets contain a minimal number of trades in which counterparties are listed. On balance, this information is entitled to protection. As to the first *Bass* factor, there is nothing in the record indicating that the counterparties' names are known by others outside the sources' businesses or outside the Publishers' respective companies. The Publishers never

publicly disclosed counterparty identities.  Second, the Publishers promised faithfully to protect counterparty identities and prohibited their own employees from disclosing confidential information.  The Publishers have vigorously opposed disclosure of counterparty identities in other administrative and judicial proceedings.  Third, disclosure of counterparty identities for 2000 and 2001 transactions may harm the Publishers and unfairly aid their competitors; this information could aid a publishing competitor to identify previously unknown market participants for certain locations. A competitor could then approach that company and solicit  participation for their survey.  Fourth, the Publishers spent years trying to persuade their sources to include counterparty identities.  The Publishers sought this information to aid verification of the reported trade information and potentially to eliminate duplicate reported trades. Finally, absent disclosure by the Publishers, other newsletters would not be able to learn many of the counterparties' identities.  Collectively, these factors weigh in favor of protecting the identities of counterparties as trade secrets.  *See In re Bass*, 113 S.W.3d at 739–40.

*Price and Volume Data.*— The Publishers also seek to redact the reported price and volume trading data listed on the Spreadsheets, contending that the price, volume, and other non-public information is not public.  The Publishers contend this data has commercial value in the marketplace and that it is provided by traders with the

understanding that it will remain confidential.  While the information was provided by the Publishers under the same promises of confidentiality and while this information might be proprietary or have commercial value *if* combined with the name of the company that entered into a transaction, disclosure of the price, volume, and location data *per se* (without the trading company's and counterparty's names) poses little or no trade secret concerns. The reported trades occurred over five years ago.  To the extent that certain companies' historical trade data remains sensitive or valuable in the aggregate five years after the transactions, because the trades may show commercially sensitive patterns, redaction of the trading partners' identities prevents competitors from using the information to the reported companies' disadvantage.  Redaction of the trading companies' identities also alleviates possible concerns of traders and companies who actually submitted the reports on condition of anonymity; no specific trade data can be attributed to a particular company or trader.  The Court will not redact sales price, volume, and location data from the Spreadsheets.

*Layout of* **Inside FERC** *Spreadsheets.—* Last, McGraw-Hill urges the Court to seal the *Inside FERC* Spreadsheets because the layout of these documents is creative and proprietary, and disclosure allegedly will destroy years of work to create a visually significant format, thereby giving an unfair advantage to McGraw-Hill's competitors. The Court disagrees.  While the layout is certainly functional, it simply is not

sufficiently unique as to be entitled to protection as a trade secret.  McGraw-Hill has

not shown it has a substantial interest in preventing the disclosure of the format of the

Spreadsheets—sealing hard copies of Spreadsheets received in evidence is therefore

not warranted.  *See Osborne*, 68 F.3d at 99.  No electronic versions of the

Spreadsheets, the Source Data, or the Databases will be filed.  Thus, no embedded

formulas, radio buttons, tool bars, frozen window panes, or other proprietary matters

embedded in the Spreadsheets or editorial content will be disclosed.

**Waller-Osborne** *Analysis.*— The Court reiterates that the "right to an open and

public trial is a shared right of the accused and the public, the common concern being

the assurance of fairness." *Press-Enterprise Co.*, 478 U.S. at 7; *Waller*, 467 U.S. at

46.  The presumption in favor of an open trial dictates that the Court scrutinize carefully

the Publishers' requests to seal or redact evidence from trial.  As noted above, the

Court has concluded that the identities of the Publishers' sources, the reported trading

parties and the listed counterparties are entitled to protection as trade secrets.  The

Court now analyzes the interests set forth in *Waller*, as modified by *Osborne*, 68 F.3d

at 99.

The Court concludes that the Publishers have justified the redaction to the extent

described above.  Redaction here is comparable to the partial closure of the trial.  The

Case 4:04-cr-00514   Document 227   Filed in TXSD on 08/25/06   Page 24 of 26

Publishers have shown substantial interests that are likely to be prejudiced if complete disclosure of the Spreadsheets is ordered. *See Osborne*, 68 F.3d at 99.

Under *Waller* and *Osborne*, the partial closure, *i.e.*, redaction, must be no broader than necessary to protect the interest. *See Waller*, 467 U.S. at 48. Sealing the hard copies of the Spreadsheets exhibits as the Publishers request is too broad a remedy and simply is not necessary to protect the interests advanced by the Publishers. Redacting the source, trading party and counterparty identities is narrowly tailored to protect the proprietary interests at hand. These limited restrictions on disclosure of twenty trial exhibits, out of approximately 600 trial exhibits in total, adhere to the notion of public trials. The names of the Publishers' sources of trade information, the trading companies, and the counterparties other than Dynegy and El Paso are irrelevant to the merits of the instant criminal cases. The public's right to understand the evidence against Defendants here does not require publication of trading and reporting practices by other companies. Redaction as defined in this Memorandum will not burden the public's or Defendants' rights to an open trial. *See Osborne*, 68 F.3d at 99.

***Constitutional Arguments.*—** The Publishers additionally urge the Court, in weighing the competing interests in this case, to consider constitutional protections afforded the Publishers as news gathering entities in other proceedings. Specifically, the Publishers argue that the substantial constitutional protections afforded to them in

P:\ORDERS\1-CRIMIN\2001-2004\04-514PublishersExhibits.wpd                    24

civil proceedings to protect the identity of their sources under the reporter's privilege supports sealing the Spreadsheets.   The Publishers are asserting in other civil proceedings that the qualified reporter's privilege protects the identity of their sources. The redactions here protect the identity of the Publishers' sources, other than El Paso and Dynegy. The Court is unpersuaded that the limited disclosures permitted here will undermine any genuine interest the Publishers might have in protecting their data and sources in other civil proceedings.

## III.   **CONCLUSION AND ORDER**

For the reasons discussed above, hard copies of Source Data received in evidence will be filed in the public record without redactions.   Hard copies of Spreadsheets received in evidence will be filed in the public record with the identity of the trading companies, other than Dynegy and El Paso, redacted.   The names of counterparties for all reported trades also shall be redacted.   It is therefore

_____**ORDERED** that interested party The McGraw-Hill Companies, Inc.'s Motion to Intervene and For Limited Protective Order [Doc. # 119] is **granted in part and denied in part**.  It is further

**ORDERED** that interested parties Intelligence Press, Inc. and NGI, Inc.'s Motion For Limited Protective Order [Doc. # 129] is **granted in part and denied in part**. It is further

**ORDERED** that the Government must supply the redacted copies to McGraw-Hill and NGI within ten (10) business days of entry of this Order.  McGraw-Hill and NGI must notify the Government of objections to specific redactions within five (5) business days thereafter.  None of the proposed redacted versions of the Spreadsheets shall be filed until the parties and Publishers have agreed on the redactions.  If there is an unresolved dispute between the Government and either McGraw-Hill or NGI, the parties shall promptly provide to the Court in Chambers courtesy copies of the respective proposed Spreadsheets and the Court will decide the matter.

**SIGNED** at Houston, Texas, this **25th** day of **August, 2006**.

Nancy F. Atlas
United States District Judge