IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-04-514-SS |
| | § | |
| MICHELLE VALENCIA | § | |

## MEMORANDUM AND ORDER

Defendant Michelle Valencia, a former natural gas trader with Dynegy, Inc. ("Dynegy"), was charged in a Second Superseding Indictment (the "Indictment") in this criminal case with thirteen counts of violating the false reporting provision of the Commodity Exchange Act, 7 U.S.C. § 13(a)(2) (the "CEA"), one count of conspiracy to violate the CEA (18 U.S.C. § 371), and nine counts of wire fraud (18 U.S.C. § 1343).[1]  During pretrial motions, throughout discovery, and at trial, all parties were focused primarily on the less familiar CEA counts rather than on the wire fraud counts.

After a four week jury trial, Valencia was convicted on seven counts of wire fraud (counts 15, 17, 18, 20, 21, 22, and 23).  She was found "not guilty" on three of the CEA counts and two of the wire fraud counts, and the jury did not reach a verdict on the conspiracy count and on five of the CEA counts.

---

[1]      Valencia originally was charged in Criminal Case No. H-03-024.  The Government has advised the Court that those charges are subsumed in their entirety by counts in the Second Superseding Indictment in Criminal Case No. 04-514.

The case now is before the Court on Valencia's Motion for Judgment of Acquittal and Motion for New Trial [Doc. # 226].[2]  After careful consideration of the parties' written and oral arguments, the entire record of this case, the evidence presented at trial, and the applicable legal authorities, the Court **denies** the motion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 2002, the United States Commodity Futures Trading Commission ("CFTC"), the Federal Energy Regulatory Commission ("FERC"), and the United States Department of Justice, among other government agencies, began investigating the natural gas industry.  These investigations resulted in a number of criminal charges, including those against Valencia.  The charges against Valencia arise from her monthly submission of false trade data on numerous occasions between December 1999 through May 2001 to The McGraw-Hill Companies, Inc. ("McGraw-Hill"), through its monthly publication *Inside FERC*'s *Gas Market Report* ("*Inside FERC*"), and to Intelligence Press, Inc., through its monthly publication *Natural Gas Intelligence* ("*NGI*").  *Inside FERC* and *NGI* (collectively, the "Publications") each reported throughout the relevant time period on the natural gas industry and published on the first business day of each

---

[2]       On August 3, 2006, while the jury was still deliberating, Valencia and Singleton filed a "Defendants' Joint Renewed Motion for Judgment of Acquittal and Memorandum in Support" [Doc. # 213].  That motion addressed the CEA counts.  The Court believes this motion was denied orally during jury deliberations.  To the extent the Court may not have already done so, the motion is **denied as moot**.

month a natural gas price index for physical gas transactions at each of numerous delivery natural gas locations ("hubs") in the United States and Canada.

To create the monthly natural gas indices, editors from *Inside FERC* (Kelley Doolen) and *NGI* (Mark Curran) each sent to dozens of natural gas traders (generally traders who worked for large sellers and buyers of natural gas) requests for confidential trade data on the traders' companies' "baseload" fixed-price natural gas transactions negotiated during approximately the last five business days of the month (known as "bidweek").[3]  The Publications asked the sources to provide transaction details such as price, volume, location for delivery, and identity of the other contracting party (the "counterparty") for each qualifying gas trade.  The instructions in 1999 and early in 2000 were not as detailed as they became later in 2000 and in 2001.  There is evidence that *Inside FERC* asked its sources to report only data on actual baseload physical natural gas transactions entered into during bidweek, *i.e.*, private bilateral commercial transactions in which the parties agreed that natural gas was to be physically delivered. *NGI*, an internet newsletter, did not provide written instructions, but the Government

---

[3]      "Baseload" natural gas transactions are contracts to deliver a specified quantity of natural gas at a designated location each day of the calendar month stated in the contract.  These transactions often were negotiated directly between traders of the contracting companies.  During the relevant period, some contracts were entered into through voice brokers or on Internet platforms such as Enron-On-Line ("EOL").  These bilateral physical gas contracts are distinct from financial transactions such as futures contracts traded on the New York Mercantile Exchange ("NYMEX") or "swaps."

presented evidence that it was understood that *Inside FERC*'s instructions applied to reports to *NGI*. For most of the relevant period, survey responses were usually submitted to the Publications via email.[4] Many were submitted to both Publishers on *Inside FERC*'s electronic form, which had instructions at the top of the first page.

The Publications' editors relied heavily on the confidential survey responses to create the monthly indices. The Publications' editors created databases of all the traders' submissions.[5] The editors then checked the databases for typographical errors, reviewed the data for reliability based on the editors' knowledge of the current and historical natural gas market forces in different locations,[6] and eliminated from the active databases the reports of transactions the editors believed to be anomalous or unreliable.[7] The editors then calculated the volume weighted averages of the remaining reported transactions and decided on the basis of all the available information what number to issue as the monthly index for each location. In a typical month, dozens if

---

[4]     Early data was submitted to *NGI* by fax.

[5]     The *NGI* editors considered all this data in light of other trade information obtained orally (usually over the phone) from traders and others with interest in the natural gas industry. Apparently, reporters occasionally accepted trade reports over the phone if the report was submitted very close to the index publication deadline.

[6]     It appears that the editors were somewhat skeptical of traders' complaints that others were "manipulating" the market.

[7]     The editors referred sometimes to these eliminated trades as "outliers" because they appeared to be aberrations compared to the other data.

not hundreds of transactions were reported to *Inside FERC* and *NGI* for each of the seventy locations and over a hundred locations for *NGI*.[8]

The Publications' monthly natural gas indices were used by many companies, including Dynegy, to price physical natural gas contracts, as well as to set the value of various financial contracts.[9]

Based on her submission of false reports about physical natural gas transactions, Valencia was charged with conspiring with Greg Singleton,[10] then a natural gas trader with El Paso Merchant Energy ("El Paso"), to violate the CEA, as well as substantive false reporting violations of the CEA, and wire fraud because she submitted or caused to be submitted natural gas prices and volumes that did not reflect actual physical natural gas transactions in which Dynegy (or its affiliate, West Coast LLC ("West

---

[8]    Often, the index price for *Inside FERC* matched the volume weighted average of the reported trades.  The evidence from *NGI* is a little less clear because the *NGI* editor did not retain the final worksheets that contained the precise list of putative trades that he used to create each index.  *NGI* did not publish an index price for a particular hub if it had insufficient data for a particular month concerning that location.

[9]    The Publications' sources reported their data to the publications in reliance upon the Publications' explicit agreement that the sources' identities would be kept confidential and the trade information would not be attributed to a particular company or trader.

[10]    By agreement of the parties, Valencia was tried with Greg Singleton, who was earlier charged as a co-defendant in this case but later charged separately in the superseding indictment assigned Criminal Case No. 06-080.  Singleton was convicted on one wire fraud count and was acquitted on four counts.  The jury could not reach a unanimous verdict on three counts involving alleged violations of the false reporting provision of the CEA. The Court orally denied Singleton's Motion for Judgment of Acquittal or New Trial [Doc. # 213] on November 3, 2006.

Coast")) had engaged.  Valencia presented evidence that she and other traders were simply reporting their companies' bias, or reporting trades that generally reflected the company's trading position.

## II.   MOTION FOR JUDGMENT OF ACQUITTAL

### A.   Procedural Legal Standards

"A motion for judgment of acquittal challenges the sufficiency of the evidence to convict." *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) (quoting *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)).  A jury's verdict should be upheld if any rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. *United States v. Charles*, ___ F.3d ___, 2006 WL 3114481 *3 (5th Cir. Nov. 3, 2006) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *United States v. Ragsdale*, 426 F.3d 765, 770-71 (5th Cir. 2005) (quoting *United States v. Floyd*, 343 F.3d 363, 370 (5th Cir. 2003)). In conducting this inquiry, the Court examines the evidence as a whole and construes it in the light most favorable to the jury's verdict, drawing all reasonable inferences to support the verdict. *Id.* (citing *Floyd*, 343 F.3d at 370); *United States v. Delgado*, 256 F.3d 264, 273-74 (5th Cir. 2001); *United States v. Reveles*, 190 F.3d 678, 686 (5th Cir. 1999).

"The standard does not require that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001) (citation omitted); *Reveles*, 190 F.3d at 686; *United States v. Lopez,* 74 F.3d 575, 577 (5th Cir. 1996). "If the evidence, however, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [the Court] must reverse the conviction, as under these circumstances 'a reasonable jury *must necessarily entertain* a reasonable doubt.'" *Lopez,* 74 F.3d at 577 (citations omitted; emphasis in original).

"[A court's Rule 29] review of the sufficiency of the evidence does not include a review of the weight of the evidence or of the credibility of the witnesses." *Ragsdale*, 426 F.3d at 771 (quoting *Floyd*, 343 F.3d at 370) (internal quotation marks omitted). "A jury is free to choose among reasonable constructions of the evidence.  And it retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses."  *Loe*, 262 F.3d at 432 (citation and internal quotation marks omitted).

Additionally, the interests of justice are not a factor if the Government's case was legally sufficient.  *See United States v. Salazar*, 958 F.2d 1285 (5th Cir. 1992); *United States v. Brown*, 587 F.2d 187, 190-91 (5th Cir. 1979).

B.     **Wire Fraud Elements**

"To prove wire fraud under 18 U.S.C. § 1343, the government must prove: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *United States v. Ingles,* 445 F.3d 830, 838 (5th Cir. 2006) (internal quotation marks omitted)).  "The government need not prove that the accused used the mails himself or actually intended that the mail be used."[11]  *United States v. Pazos*, 24 F.3d 660, 665 (5th Cir.1994); *McClelland*, 868 F.2d at 707; *Pereira v. United States*, 347 U.S. 1, 8 (1954).  "One 'causes' the mails to be used '[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen . . ..'" *Ingles*, 445 F.3d at 835 (quoting *Pereira*, 347 U.S. at 8-9).  The use of the wires must be "incident to an essential part of the scheme." *United States v. Mills,* 199 F.3d 184, 188 (5th Cir. 1999).

Also, there must be proof of the materiality of the fraud, *see Loe*, 248 F.3d at 458, and the defendant's intent "that some harm result from the fraud," *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005) (quoting *United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000)).  The need to prove a wire fraud defendant's intent to

---

[11]     Because the wire fraud statute contains the same relevant language as the mail fraud statute, the same analysis applies to both statutes. *See United States v. Mills*, 199 F.3d 184, 188 (5th Cir. 1999) (citing *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987)).

cause harm may be satisfied by showing an "intent to defraud for the purpose of personal gain." *United States v. Powers*, 168 F.3d 741, 746 (5th Cir. 1999); *Richards*, 204 F.3d at 207.

Although the offense of wire fraud requires a victim, the victim need not be named in the indictment.  "The focus of the mail fraud statute is upon the use of the mail to further a scheme to defraud, not upon any particular kind of victim." *United States v. Hatch*, 926 F.2d 387, 392 (5th Cir. 1991).  At least within certain limits, a court may logically deduce the nature of the victims even where they are not identified by the parties.  *See id.* (noting that even if the fund named in the indictment was not a legal entity capable of being a victim, it was logical to assume that the donors to the fund were victims).

### C.    <u>Analysis</u>

Valencia challenges the sufficiency of the evidence as to all counts on which she was convicted.  Having considered carefully the evidence presented at trial, the Court concludes as to each count of conviction that the evidence supports the jury's verdict.

The government presented sufficient evidence from which the jury could find that Valencia engaged in a scheme to defraud and that she used the wires, as that term is defined in the wire fraud statute, for the purpose of executing that scheme.  The

Government's theory against Valencia at trial was that she reported false trade data to the index Publishers in order to influence the index.

The evidence presented supported the Government's theory of the case. From 1999 into 2002, numerous companies entered into bilateral contracts negotiated by their own employee-traders to buy and sell natural gas for delivery at specified locations on expressly-stated fixed prices. In other instances, these companies used an alternative pricing method called "index pricing" by which they relied on an identified "index price" for the designated location for a specified  month (or period of months) in the future. In these index-priced contracts, each party took a risk on what the index price for natural gas would be when it was published on the first business day of the following month. When entering into an index-priced physical contract, the gas buyer hoped the index would be low, while the seller hoped the index would be high.

In addition to index-priced contracts for delivery of natural gas, Dynegy entered into financial contracts based on natural gas index prices. For instance, Dynegy entered into "swaps" in which, for example, Dynegy would agree with another company that each would deliver the same volume of natural gas during the same month but one party would buy at the price published in one index the following month, while the other party would buy at the price published by a different index the following month. In swaps, the parties typically did not intend that any natural gas would be delivered.

Rather, the swap was a financial mechanism and the parties settled up financially once the two indices were published.  The party buying at the higher index price would pay the counterparty the difference between that index price and the price at which the counterparty agreed to buy.

Generally, more junior traders handled physical natural gas contract trading, while more senior traders engaged in trading through financial contracts that were used to hedge (*i.e.*, to protect against financial risk of physical or other transactions) and to speculate on behalf of the employer.  Typically, traders who made contracts based in whole or in part on index prices for a particular location used the same publisher's index for all index-priced physical gas contracts and for one of the "legs" of the financial contracts based on gas at that location.  Valencia's physical gas trades were for natural gas at hubs on the West Coast, most prominently the locations known as "Malin," "Southern California" or "SoCal" and PG&E Citygate ("Citygate").  Other traders at Dynegy traded gas at Western locations such as San Juan, Permian Basin, and the Northwest Rockies.  Sometime in 2000, as Valencia became more senior at Dynegy, she also entered into financial contracts for the company that were generally tied to West Coast hub indices.

Contracts for delivery of natural gas at Malin, SoCal and Citygate generally used the *NGI* index for index-based contracts, while the other western hubs relied on *Inside*

*FERC*'s monthly indices for those locations.  As noted above, *Inside FERC* and *NGI* based their indices on reports of purported natural gas physical trades provided by the traders to the Publishers, plus any other information the Publishers could garner.

Against this background of natural gas trading during the relevant times, the Government presented ample proof from which the jury could find that the scheme to defraud required Valencia to submit the same false "trade" information to both Publishers in order to skew both indices to favor the trading positions Dynegy had just before month-end at each reported location.  Valencia argues that neither she nor Dynegy made any trades at Malin or SoCal using the *Inside FERC* index, which was the only index tied to the reports cited in counts 15, 18, 20, 22 and 23.  There was sufficient evidence, however, from which the jury could find that Valencia hoped to influence both indices each month — even though only one index was generally used at each location — because she believed that if both indices moved in similar manner, the index in which Valencia was primarily interested gained enhanced credibility.[12] The jury also was entitled to find from the evidence that Valencia, as part of the scheme to defraud, sought to curry favor with both Publishers by submitting trading information

-----

[12]  Valencia argues that this theory is not supported by the Indictment or the proof.  The Indictment alleges that she sought to increase "the amount of profit [she] earned on her trades" and the Government has no obligation to allege in the Indictment any, let alone all, of a defendant's possible motives for a scheme to defraud in connection with a wire fraud charge.  *See, e.g., Richards*, 204 F.3d 177 (5th Cir. 2000).

for all the hubs where Dynegy frequently traded, even though one of the indices was not typically used for transactions in that location.

The Government presented evidence that Valencia used the wires – emails or facsimile transmissions – to execute the scheme to defraud described above. The specific communications on which the counts of conviction are based are as follows:

| Count | Report Sent to Index Publishers & Exhibit No. | Locations Listed in Dynegy Report (& Index Typically Used for Index-Based Trades at that Hub) |
|---|---|---|
| 15 | July 31, 2000 Email from West Coast LLC to *Inside FERC* – GX 11, 11A | Malin (*NGI*), SoCal (*NGI*) |
| 17 | Aug. 31, 2000 Fax from West Coast LLC to *NGI* – GX 22, 22A | Malin (*NGI*), SoCal (*NGI*) |
| 18 | Aug. 31, 2000 Fax from West Coast LLC to *Inside FERC* – GX 22, 22A | Malin (*NGI*), SoCal (*NGI*) |
| 20 | Nov. 30, 2000 Email from Dynegy to *Inside FERC* – GX 46, 46A | Malin (*NGI*), SoCal (*NGI*), San Juan (*Inside FERC*), Permian (*Inside FERC*), Rockies (*Inside FERC*), PGE Citygate (*NGI*) |
| 21 | Jan. 31, 2001 Email from Dynegy to *Inside FERC* (two emails) – GX 335, 337; see GX 56, 56A | SoCal (*NGI*), Malin (*NGI*), Permian (*Inside FERC*), San Juan (*Inside FERC*), Rockies (*Inside FERC*) |
| 22 | Feb. 28, 2001 Email from Dynegy to *Inside FERC* – GX 59, 59A | SoCal (*NGI*), Malin (*NGI*), San Juan (*Inside FERC*),PGE Citygate (*NGI*) , Opal, CIG |
| 23 | Feb. 28, 2001 Telephone call between Valencia and Kelly Doolen of *Inside FERC* – GX 172, 172A | [Discussed email report charged in count 22] |

Valencia does not deny that she submitted, or caused to be submitted, data that was literally false. She instead argues that the data submitted was not intended to

defraud anyone because the reported trades were "representative" in that they were at prices and volumes that were within the "high" and "low" of actual trades for natural gas for the day of bidweek at the locations in issue.  There is no dispute that if the value of Dynegy's trading position were improved by the value of the index, Dynegy's trading party ("counterparty") experienced a corresponding detriment on the transaction.  If Dynegy's overall trading position for the month was "long" (meaning Dynegy was a net buyer of natural gas or in index contracts), Dynegy traders hoped the related index would be high.  On the other hand, if Dynegy's overall position was short (meaning Dynegy was required to deliver more gas than it purchased), the company would want the index to be lower so the company could acquire the net volumes at a lower price.  The Government's evidence, apparently credited by the jury, established that Valencia knowingly participated in a scheme to defraud Dynegy trading partners by submitting or causing others to submit "representative" Dynegy trade data (rather than accurate data of actual trades) to *Inside FERC* in order to influence the index prices.  This evidence included proof that Dynegy traders sometimes did not report large physical trades at Valencia's trading locations, even though other smaller trades or trades with prices that were deemed more favorable to Dynegy's book of transactions were reported in whole or in part.  This evidence permitted the jury to find beyond a reasonable doubt that the traders, including Valencia, elected to omit these

volumes because of the concern that they would influence the volume weighted averages "adversely" to the net positions Valencia and others believed Dynegy held at the time.[13]

Valencia also argues that certain wire fraud counts parallel the false reporting counts included in the Indictment under the CEA.  For instance, Valencia contends that count 20, a wire fraud charge arising from a November 30, 2000 email to *Inside FERC*, matches the CEA charge in count 10, and is restricted to three false reported trades. The Court disagrees.  The wire fraud counts stand on their own merit.  The similarities of any such counts to CEA charges does not restrict the Government to arguments relevant only to the CEA counts.

Valencia also challenges the sufficiency of the evidence supporting the conviction on count 23, which is based on a phone call between Valencia and *Inside FERC*'s editor, because the phone call did not address substantively the trades reported for San Juan, the hub charged in the Indictment.  The record does not support this argument.  Valencia affirmed during the call that the San Juan trades were "fine,"

---

[13]    Valencia also contends that because the Publishers exercised discretion in setting each of the indices, consideration of the volume weighted average for each location is not probative.  The Court is unpersuaded.  The jury was entitled to conclude from the testimony that a substantial factor for each index each month was the volume weighted average of all trades the Publishers' editors received, even though the editors culled out the reported trades that they deemed unreliable or un-representative.  Valencia was apparently aware of the editors' practice of eliminating aberrant trades and, for that reason, submitted reports of trades at prices within the "high" and "low" for the day for the location being reported.

indicating that they were accurate reports when in fact all the data submitted was false.[14]  This evidence was sufficient to establish that telling the *Inside FERC* editor that false trades were actually "fine" was a use of the wires in furtherance of the scheme to defraud described above and established by other evidence at trial.  The evidence supports Valencia's conviction on Count 23.[15]

Valencia also challenges the sufficiency of the evidence on count 21.  In this count, the email in issue, dated January 31, 2001, was sent to *Inside FERC* and included reports of thirty-three Dynegy trades at San Juan.  The evidence revealed that there were two emails sent from Valencia's computer at Dynegy on January 31, 2001.  The first listed "trades" at several locations other than San Juan, and the second, sent twenty minutes later, listed thirty-three "representative" trades at San Juan.  Valencia argues that the evidence demonstrates that she was not involved in sending the second email, which physically was sent by a lower level trader at the explicit direction of the

---

[14]     Valencia did not correct Doolan earlier in the phone call when he said "Ok, it looks like you're ok in the Juan."  This is further evidence of her intent to engage in the scheme to misrepresent Dynegy's trades to *Inside FERC*.

[15]     Valencia contends that the Indictment and the Government's Bill of Particulars [Doc. # 112] did not disclose what in the phone call was false, and there never was any disclosure that the San Juan information was the focus of count 23.  Valencia thus contends that the Government constructively amended the Indictment at trial, citing *United States v. Chambers*, 408 F.3d 237, 241 (5th Cir. 2005).  A constructive amendment occurs when the jury could have convicted the defendant based on a factual basis that effectively modifies an essential element of the offense charged in the indictment.  *See id.*  There was no constructive amendment of the Indictment here.

Dynegy West Desk financial trader, Scott Leslie, a person to whom Valencia reported. Valencia also points out that her trades for the San Juan location left her a "net buyer" in January 2001, thus suggesting that her personal trades would have benefitted from the *Inside FERC* index for that location being lower, not higher, the likely result from Dynegy's data submitted for San Juan.  The jury was able to consider this information in its deliberations, but apparently was not persuaded.  The jury was not bound to adopt Valencia's position here.  While her personal book of physical trades may have not benefitted from a higher *Inside FERC* index at San Juan that month, the jury was entitled to consider Valencia's role in "reporting the bias" her boss perceived would aid Dynegy's net position based on the many trades made by her boss, and others under his direction.

Finally, Valencia was convicted of count 17 which charges her with wire fraud based on a facsimile ostensibly sent by Dynegy affiliate West Coast LLC, on August 31, 2000 to the Publisher of the *NGI* index, for trades at SoCal and Malin. There is no dispute that the information on the fax is false; West Coast LLC did not engage in physical natural gas trades matching any of the entries on the report. Valencia contends by analogy to false statement charges brought under 18 U.S.C. § 1001 that there was insufficient evidence of "false" and "material" representations. She argues that the "question" she was answering through the report sent by West

Coast LLC was ambiguous, and that her conduct in sending "representative" trade information rather than accurate data was "inadvertent." She also seems to contend that there was no evidence that she was involved in the transmission of this submission to *NGI* at all.[16] These arguments are rejected. The jury had more than sufficient evidence to decide that Valencia was involved — at least indirectly — in sending the transmission to *NGI*, and that she intended through the transmission that *NGI*'s publishers be deceived into believing that West Coast LLC had engaged in the reported transactions.[17]

The evidence presented by the Government at trial and apparently accepted by the jury as true, established that Valencia engaged in a scheme to defraud and that she used the wires to execute the scheme to benefit herself to the detriment of Dynegy

---

[16]     Early in Valencia's tenure at Dynegy, she was one of the people to whom financial traders gave instructions about what to report to the Publishers. Over time, however, she became one of the traders who told lower level traders what to report, either by dictating specific trades or more generally by giving ranges. Although Valencia argues that there was insufficient evidence that she sent certain emails, most of the emails in issue were admittedly sent by Valencia or from her computer. The jury considered the factual disputes about who decided what trade information would be reported to each Publisher each month and who sent or caused to be sent each relevant email and, for the counts of conviction, determined that the evidence proved Valencia's guilt beyond a reasonable doubt.

[17]     Valencia also argues that the Government's expert, Matthew O'Loughlin, created a chart (GX 685) that contained materially "false" information in that it showed – exclusively based on voice broker data – that Dynegy had isolated trades at Malin and SoCal in the months in issue that settled on the *Inside FERC* index, rather than *NGI*, the typical index for contracts at those locations. This argument is discussed more fully, and rejected, in connection with Valencia's Motion for New Trial.

trading partners.  Because the wire fraud convictions are supported by the evidence, Valencia is not entitled to a judgment of acquittal.

## III.   **MOTION FOR NEW TRIAL**

### A.   **Legal Standards**

A district court may grant a new trial "if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  "A motion for a new trial is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial . . . should be invoked only in exceptional cases . . .."  *United States v. Sipe*, 388 F.3d 471, 493 (5th Cir. 2004) (citation and internal quotation marks omitted). The power to grant a new trial "should be exercised infrequently by district courts, unless warranted by 'exceptional' circumstances."  *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005).  The trial judge may grant a new trial only if she finds that the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.  *See id.*; *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004), *cert. denied*, 544 U.S. 978 (2005).  If the Court "finds that a miscarriage of justice may have occurred at trial, . . . this is classified as such an 'exceptional case' as to warrant granting a new trial in the interests of justice."  *Sipe*, 388 F.3d at 493 (citations and internal quotations omitted).

The trial judge is to grant a new trial under Federal Rule of Criminal Procedure Rule 33 only if there is error that is not harmless.  *See United States v. Munoz*, 150 F.3d 401, 413 (5th Cir. 1998).  The trial judge may weigh the evidence and assess credibility of the witnesses in reviewing a motion for a new trial.  *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir. 2005); *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997).  Nonetheless, the Court must refrain from reweighing the evidence and setting aside the verdict simply because she feels some other result would be more reasonable.  *See Munoz*, 150 F.3d at 413 (citing *Robertson*, 110 F.3d at 1118).

## B.   Matthew O'Loughlin

Valencia contends that she is entitled to a new trial because the Government's expert, Matthew O'Loughlin, produced at the "eleventh hour" a supplement to his earlier reports.  The supplement showed — allegedly for the first time — that voice brokers' data revealed that there were some Dynegy transactions based on the *Inside FERC* index at Valencia's trading locations.  This evidence, argues Valencia, was devastating to her defense that certain emails sent to *Inside FERC* could not support a mail fraud conviction because Dynegy settled all its Malin and SoCal trades on the *NGI* index, not the *Inside FERC* index.

Valencia complains that this was a "new report" that would have required the review of "tens of thousands of pages of documents" and that O'Loughlin did not

identify the trades on the summary.  Valencia does not dispute that O'Loughlin's testimony and summary correctly represent the data the Government obtained from voice brokers.  Valencia instead points to her expert's post-trial analysis of Dynegy's own corporate records and those of its trading partners for the relevant times. According to Valencia's expert, these records show the subject trades were settled on the *NGI* index, not the *Inside FERC* index as O'Loughlin told the jury.  Valencia contends that she is entitled to a new trial because these inconsistencies between the voice brokers information and the trading companies' records makes O'Loughlin's testimony "false."

First, the Government produced the underlying data well prior to trial and was under no obligation to explain or single out any information contained therein.  The supplemental report containing the specific analysis at issue was produced to the defense two days before O'Loughlin testified.  As a result, Valencia's complaint regarding the timing of the supplemental report does not support a new trial.

More importantly, Valencia relies on her expert's view that the corporate records are accurate to prove that O'Loughlin's testimony based on voice broker information is false.  The Court need not and does not decide whether the voice broker data or the Dynegy records correctly reflect the trading parties' transactions. The Court must grant a new trial on the basis of false testimony only when there is a reasonable likelihood

that the truth would have affected the jury's verdict.  *See United States v. Anderson*, 475 F.2d 1347, 1355 (5th Cir. 1978).  As was discussed more fully in connection with the Motion for Judgment of Acquittal, Valencia's characterization of the scheme to defraud is excessively narrow.  Rather than there being, as Valencia contends, one scheme to send false data to *Inside FERC* and a separate, unrelated scheme to send false data to *NGI*, the Government asserted and the jury was entitled to find that the scheme involved sending reports of similar, if not identical, false trades to both publications regardless of which publication's index the industry typically used for a particular location.  Consequently, Valencia's argument that the jury should consider only emails involving false trades sent to the single publication publishing the index for the location reflected in the trades is too restrictive.

To the extent Valencia argues that her expert's post-trial analysis constitutes "new evidence" warranting a new trial, the record does not support Valencia's argument that she is entitled to a new trial.  To obtain a new trial based on new evidence, the "defendant must prove that (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence of the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal." *United States v. Wall*,

389 F.3d 457, 467 (5th Cir. 2004).[18]  If the defendant fails to establish any of the five factors, the Court should deny the motion for new trial.  *See United States v. Ardoin*, 19 F.3d 177, 181 (5th Cir. 1994).

Initially, the Court questions whether an expert's post-trial analysis constitutes "new evidence" for purposes of this analysis.

In any event, Valencia has not shown that the discrepancy between O'Loughlin's testimony (based on voice brokers' data) and her expert's conclusions (based on records of Dynegy and its trading partners) is material evidence that, if introduced in a new trial, would probably produce an acquittal on the mail fraud counts.  O'Loughlin was clear that he relied on voice broker data only and testified that he found only one or two trades in each of only three months that were based on the *Inside FERC* index for Valencia's trading locations in issue.  Thus, construing the evidence in the light most favorable to the Government, the *Inside FERC* index-based trades – at best – were aberrations and were *de minimis* in number and volumes in comparison to thousands of Dynegy trades based on the *NGI* index for those locations.[19]  The

---

[18]     These factors are generally referred to as the "*Berry*" test, first articulated in *Berry v. State*, 10 Ga. 511 (1851).

[19]     The bulk of the parties' trial arguments and evidence was directed to the CEA false reporting counts, to which O'Loughlin's testimony was particularly pertinent.  In contrast, there was no requirement on the wire fraud counts that the Government prove that one of the indices was or tended to be affected by the false reports, as was necessary for the false reporting CEA counts.

dispositive issues on the wire fraud counts were materially different than for the CEA false reporting charges. For wire fraud, the jury simply needed to decide if the Government had proven beyond a reasonable doubt that Valencia knowingly and intentionally participated in a scheme to defraud, the purpose of which was advanced in some manner by the transmission of false trade data. Whether there was an isolated trade based on the *Inside FERC* index for the month charged in a particular count in the Indictment was not significant for the wire fraud charges. Therefore, contrary to Valencia's contentions, O'Loughlin's testimony was of marginal importance to the wire fraud theories.

In summary, there was strong, virtually undisputed evidence that Valencia sought by the Dynegy (and West Coast L.L.C.) reports to counter the market effects that she believed (correctly or not) that Enron's active trading had on the price of physical natural gas. Further, there was virtually undisputed evidence that Valencia "reported the company's bias" to the Publishers by submitting "representative" trade data in the hope that the resulting indices would favor Dynegy's month-end trading positions. The jury thus was entitled to find that one aspect of the scheme was to have the data submitted appear accurate and reliable. This deception supports the wire fraud convictions. The evidence showed that the traders submitted the same data to both index Publishers so the indices for each trading location would move in the same

direction each month, even though they were not identical.  Valencia's argument that she is entitled to new trial because O'Loughlin's testimony was new, was false, and was harmful is rejected.

### C.   Glenn Labhart

Valencia argues that she is entitled to a new trial because the Government "misrepresented Glenn Labhart as a 'fact' witness." Motion, at 13.  At trial, Labhart summarized complex and voluminous Dynegy trading records and testified about Dynegy's overall trading positions at the end of each of several trading months.  He also explained the effect on Dynegy's trading position of a one penny movement in the pertinent indices at each of the hubs in issue.  Valencia argues that much of Labhart's testimony at trial involved work beyond his role while employed at Dynegy, pointing out that Labhart testified he had to "more forensically look at the data" and that "this was not something that when we ran this project, we were very familiar with what was happening with regards to the indexes." Labhart Trial Testimony, July 27, 2006, at 29. The Court, before allowing Labhart to testify, conducted a *Daubert* hearing[20] and concluded that he was a fact witness on whom the Government sought to rely for his particularized knowledge acquired through his work at Dynegy during times relevant to the charges in the Indictment.  Labhart's testimony was essentially arithmetic

---

[20]    *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

calculations and, although he may have viewed the work from a different perspective when preparing for trial, the work was essentially the same.   Labhart's isolated comments at trial, cited by Defendant, do not alter the Court's conclusion that Labhart's testimony was primarily that of a fact witness who did not need to provide an "expert report."

Valencia also argues that Labhart is an expert because the Government paid him for his many days of work.  It appears that the Government had paid or was going to pay Labhart estimated fees of more than $88,000. *See* Exhibit K to Motion, at 2.  The Court is unpersuaded that payments by the Government to Labhart for his pretrial work, rather than for his testimony, makes him an expert witness.  Valencia cites no legal authority for this proposition and the Court knows of none.  Labhart testified about matters in his personal experience working for Dynegy during the period in issue in this case.  He relied on company records that were within his realm of responsibility while employed at Dynegy.  He needed copies of the records in order to reconstruct the database for the requested analysis.  According to Labhart, he performed analysis that was similar to what he was responsible for doing while employed by Dynegy.  The Government paid Labhart for this work because, at the time of discovery and trial in this case, he was a consultant in his own company and was required to spend hundreds

of hours on the requested work.  Labhart had no obligation to donate his time to this project.[21]

Valencia also challenges the timing of the Government's production of Labhart's detailed analysis only two days before his testimony.  Valencia contends that this short notice violated Rule 16 and deprived her of a meaningful exercise of her Sixth Amendment right to cross-examination.

The Government's production of materials from Labhart must be evaluated in context.  Well before trial, the Government produced all of Dynegy's trading records. The Government also made it clear that it would obtain, or Defendant could request directly from Dynegy, any other records they wanted or needed.[22]  Less than two weeks before trial commenced, but a month before Labhart testified, the Government obtained

---

[21]  Valencia also complains that Labhart testified from an "undisclosed database" that enabled him to do the "penny-up/penny-down" analysis of movement in the index prices.  Valencia apparently contends that Labhart did not use all the records he requested from the Government and Dynegy.  The Court rejects the argument that it is improper for a witness to use some, but not all, available records.

[22]  Defense counsel repeatedly complained that they did not have or could not open all the electronic copies of records produced by the Government.  The Court, without making findings on the validity of the defense's claims, ordered on several occasions that the Government produce the materials a second or third time.  The Court is unpersuaded that the defense was denied timely production of any Dynegy trading documents or other discovery materials pertinent to their defense.

at Labhart's request a CD containing a subset of information from Dynegy's trading records.  The Government promptly turned over to the defense a copy of the CD.[23]

The Court is unpersuaded that Valencia is entitled to a new trial based on the delay in production of Labhart's conclusions, database or testimony.  First and foremost, the issue for wire fraud was whether Valencia knowingly participated in a scheme to defraud Dynegy's trading partners and, in furtherance of that scheme, used or caused others to use the wires.  Labhart's challenged testimony consisted of details about the effect of a penny movement up or down of the index prices on Dynegy's West Desk portfolios at month-end.  The proposition that a change in an index price would have a financial effect on Dynegy's trading portfolio was well established in the record through fact witnesses other than Labhart.  Indeed, many witnesses who worked with Valencia explained this aspect of natural gas trading.  This concept in Labhart's testimony could not have been a surprise to the defense.

There was ample evidence that, at the direction of the senior financial traders, Dynegy physical traders (including Valencia) were to "report the bias" to the index

---

[23]  The defense complained that there was data from 20,000 trades on the CD and that the information was "new" in that it had not previously been disclosed.  This contention is not supported by the evidence.  The CD contained a subset of Dynegy's extremely voluminous trading records and, therefore, it is not surprising that the defense may not have been familiar with the full scope of the information on the CD.  Furthermore, the Court  granted defense counsel a pre-trial opportunity to meet informally with Labhart.  The parties dispute why the meeting terminated after about 30-40 minutes, but it appears that for whatever reason the defense did not take advantage of this unique opportunity to obtain substantive information from Labhart about his methodology.

Publishers.  This meant that the traders were reporting data to favor Dynegy's trading positions – based on the financial traders' beliefs from records available to them at the time.  There was substantial evidence that the Dynegy West Desk practice was for the financial traders (including Valencia at times) to assess where their personal and the West Desk's overall portfolio stood (*i.e.*, whether the company was net long or short in natural gas at the pertinent locations) very near month end in order to create the particular "representative trades" to be reported to the Publishers.[24]  In this manner, Dynegy traders hoped to influence the index levels in Dynegy's favor.  Because the success or failure of this scheme is immaterial, the detail contained in Labhart's testimony was unimportant to the wire fraud counts.

Valencia complains that the Government's pre-trial production violated Rule 16 and prevented her from knowing the details and methodology of Labhart's calculations prior to his testimony at trial.  Even if Labhart's calculations were significant to the Government's wire fraud theory, which they are not, the Government's delay in divulging Labhart's testimony does not justify a new trial.  Her counsel was able to cross-examine Labhart at some length.  Indeed, counsel's cross-examination revealed

---

[24]    While the reports of putative trading data were submitted with prices between the high and lows of the days the trades were supposed to have occurred, the volumes and exact prices were designed for each location so the various volume weighted averages of those "trades" would be at the higher or lower end of the range in the hope that the resulting index would favor the company's net position.

what may have been errors in Labhart's analysis, such as multiple countings of the same transaction.  Additionally, the Government had no obligation to explain to the defense its trial strategy regarding the effect of index price movement on Dynegy's portfolio.  As was mentioned above, Labhart's testimony was essentially arithmetic calculations.  Although the records were voluminous, Valencia and her expert had the necessary materials to engage in this analysis prior to trial.[25]  Valencia has failed to establish that she is entitled to a new trial either because Labhart was improperly characterized as a fact witness rather than an expert witness or because the Government produced Labhart's analysis only two days before he testified.

## IV.   <u>CONCLUSION AND ORDER</u>

The Government presented evidence at trial that, when accepted by the jury as true, supports the verdict in this case finding Valencia guilty of wire fraud as charged in counts 15, 17, 18, 20, 21, 22, and 23.  As a result, Valencia is not entitled to a judgment of acquittal.

Defendant has failed to show that the interests of justice require a new trial as to the counts on which the jury returned a guilty verdict.  Specifically, Defendant has not shown that O'Loughlin's testimony was false; she proved only that it was inconsistent with other evidence.  Defendant has also failed to show that Labhart's

---

[25]      If they did not have the records, they were given opportunities to request  them.

testimony was mischaracterized as fact testimony, was provided in a manner that denied Valencia's due process rights, or materially affected the jury's verdict on the wire fraud counts.  Consequently, Valencia is not entitled to a new trial.  It is, therefore, hereby

ORDERED that Valencia's Motion for Judgment of Acquittal and Motion for New Trial [Doc. # 226] is DENIED.

SIGNED at Houston, Texas, this 14th day of December, 2006.

Nancy F. Atlas
United States District Judge